UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

MICHELLE LYNN JESKE,

  Plaintiff,

 v.              Case No. 18-C-371

NANCY A. BERRYHILL,
Acting Commissioner of Social Security,

  Defendant.

## DECISION AND ORDER

Plaintiff Michelle Jeske filed this action for judicial review of a decision by the Commissioner of Social Security denying her applications for disability insurance benefits (DIB) and supplemental security income (SSI) under Titles II and XVI of the Social Security Act. Jeske contends that the administrative law judge's (ALJ) listing discussion at step three was inadequate, the ALJ mischaracterized and improperly relied on her ability to perform daily activities, the ALJ did not account for the effect an at will sit/stand option would have on available jobs, the ALJ did not address all medical opinions in the record, and the ALJ did not do a function-by-function analysis in making his residual functional capacity (RFC) analysis. For the reasons that follow, the decision of the Commissioner will be affirmed.

## BACKGROUND

In August of 2016, Jeske filed a concurrent application for disability, DIB, and SSI, alleging that her disability began on October 31, 2012. She listed various back problems, anxiety, depression, and suicidal tendencies as the conditions that limited her ability to work. R. 315.

Following the denial of Jeske's applications, both initially and on reconsideration, Jeske requested a hearing before an ALJ. On September 7, 2017, ALJ Brent C. Bedwell conducted a video hearing where Jeske, who was represented by counsel, and a vocational expert testified. R. 30–57. At the hearing Jeske amended her alleged onset date to January 1, 2014, after the ALJ pointed out that she had substantial earnings in 2013. R. 34.

Jeske, who was 44 years old at the time of the hearing, is a high school graduate and lives with her husband, two minor children, and one adult child in Omro, Wisconsin. R. 32–35. Jeske previously worked at Lakeview Memorial cemetery as a family counselor from 2011 to 2013. R. 36. Jeske testified that after suffering a back injury while carrying a casket on October 31, 2012, she was allowed to work from home as part of worker's compensation. But once worker's compensation ended and she was required to be back in the office every day, she said she was no longer able to continue working. R. 37. Jeske also testified that she received some income from a temporary job working third-shift security at the Experimental Aircraft Association's annual "fly-in" for seven to eight days in the summer. R. 36. She testified that her supervisor allowed her to pull her van up onto the grounds next to the tent she was assigned to guard, and permitted her to sit, stand, or even lie down, as long as she stayed awake. *Id.*

Jeske testified that she has numbness in her leg as a result of her injury that has progressively gotten worse, limiting her mobility. R. 38. She described her back pain as shooting, which she takes ibuprofen to help mitigate, and radiating from her midback all the way down into her legs, and that the pain severely limits her ability to sleep at night. R. 38–39, 44. Jeske also testified that she feels stressed and depressed as a result of her inability to attend her children's activities. R. 39–40. Describing her daily activities, Jeske stated that she helps her children get ready for school, watches

2

television during the day, does some cooking, grocery shops when needed with the assistance of her kids, and spends some time on Facebook. R. 41–42, 46. She testified that she receives assistance with her daily care from her husband. R. 46. She also testified that she no longer is able to visit family in Milwaukee, take vacations with her family, or participate in her children's school and sport related activities due to her pain, and stated that she has difficulties sitting, standing, and walking, as well as difficulties lifting items heavier than a gallon of milk. R. 42, 47–48. Due to the pain and back spasms, Jeske testified that she has difficulties concentrating and focusing. R. 48.

In a written decision dated September 20, 2017, the ALJ concluded Jeske was not disabled. R. 13–23. Following the agency's five-step sequential evaluation process, the ALJ concluded that Jeske had not engaged in substantial gainful activity since January 1, 2014 at step one. R. 15. At step two, the ALJ found Jeske had the following impairments: facet arthropathy of the lumbar spine; depression; and post-traumatic stress disorder. R. 16. At step three, the ALJ determined Jeske's impairments or combination of impairments did not meet or medically equal any listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. *Id.* At step four, the ALJ concluded Jeske has the RFC to perform light work, except

> she must be allowed to alternate between sitting and standing at will; she is limited to no more than occasional stooping, crouching, kneeling, crawling and climbing of ramps and stairs; she cannot climb ladders, ropes and scaffolding; she is limited to unskilled work and to jobs involving no more than occasional decision making, changes [in] the work setting and interaction with the public, coworkers and supervisors.

R. 17. The ALJ found that Jeske was unable to perform any past relevant work. R. 21. At step five, the ALJ concluded that there are jobs that exist in significant numbers in the national economy that Jeske can perform, such as mail clerk or inspector. R. 22–23. Based on these findings, the ALJ

3

concluded Jeske was not disabled within the meaning of the Social Security Act. The ALJ's decision became the final decision of the Commissioner when the Appeals Council denied Jeske's request for review. Thereafter, Jeske commenced this action for judicial review.

## LEGAL STANDARD

The Commissioner's final decision will be upheld if the ALJ applied the correct legal standards and supported his decision with substantial evidence. 42 U.S.C. § 405(g); *Jelinek v. Astrue*, 662 F.3d 805, 811 (7th Cir. 2011). Substantial evidence is "such relevant evidence as a reasonable mind could accept as adequate to support a conclusion." *Schaaf v. Astrue*, 602 F.3d 869, 874 (7th Cir. 2010). Although a decision denying benefits need not discuss every piece of evidence, remand is appropriate when an ALJ fails to provide adequate support for the conclusion drawn. *Jelinek*, 662 F.3d at 811. The ALJ must provide a "logical bridge" between the evidence and conclusions. *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000).

The ALJ is also expected to follow the Social Security Administration's (SSA) rulings and regulations in making a determination. Failure to do so, unless the error is harmless, requires reversal. *Prochaska v. Barnhart*, 454 F.3d 731, 736–37 (7th Cir. 2006). In reviewing the entire record, the court does not substitute its judgment for that of the Commissioner by reconsidering facts, reweighing evidence, resolving conflicts in evidence, or deciding questions of credibility. *Estok v. Apfel*, 152 F.3d 636, 638 (7th Cir. 1998). Finally, judicial review is limited to the rationales offered by the ALJ. *Shauger v. Astrue*, 675 F.3d 690, 697 (7th Cir. 2012) (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 93–95 (1943); *Campbell v. Astrue*, 627 F.3d 299, 307 (7th Cir. 2010)).

**ANALYSIS**

It should be noted at the outset that Jeske does not challenge that ALJ's assessment of her mental impairment. Each of the issues she has raised pertain to the assessment of the limiting effects of the physical impairment to her back/spine. It is only those issues that I therefore address.

**A.     Step Three Determination**

Jeske asserts that the ALJ's listing discussion at step three was inadequate. At step three, the ALJ must determine whether the claimant's impairments or combination of impairments meet or medically equal the severity of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, thereby giving rise to a presumption of disability. 20 C.F.R. § 404.1520(a)(4)(iii). Jeske contends the ALJ failed to properly make such a determination in this case.

Under the SSA's regulations, a claimant is presumed disabled if she has an impairment that meets or equals an impairment found in the Listing of Impairments. 20 C.F.R. § 404.1520(d); 20 C.F.R. Pt. 404, Subpt. P, App. 1. The listings specify the criteria for impairments that are considered presumptively disabling. 20 C.F.R. § 404.1525(a). A claimant may also demonstrate presumptive disability by showing that her impairment is accompanied by symptoms that are equal in severity to those described in a specific listing. *Id.* § 404.1526(a). "'In considering whether a claimant's condition meets or equals a listed impairment, an ALJ must discuss the listing by name and offer more than perfunctory analysis of the listing.'" *Minnick v. Colvin*, 775 F.3d 929, 935 (7th Cir. 2015) (quoting *Burnett v. Barnhart*, 381 F.3d 664, 668 (7th Cir. 2004)). "The applicant must satisfy all of the criteria in the Listing in order to receive an award of disability insurance benefits and supplemental security income under step three." *Rice v. Barnhart*, 384 F.3d 363, 369 (7th Cir. 2004).

Listing 1.04 describes spinal disorders (including herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, and vertebral fractures), resulting in compromise of a nerve root or the spinal cord, with evidence of nerve root compression, spinal arachnoiditis, or lumbar spinal stenosis resulting in pseudoclaudication. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.04. It also requires, in relevant part: "Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test." *Id.*

In determining whether Jeske's impairment to her back met or equaled Listing 1.04, the ALJ stated:

> The undersigned evaluated the claimant's spinal impairment under pertinent listing 1.04, but there is no evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss accompanied by sensory or reflex loss and positive straight-leg raising test (sitting and supine); spinal arachnoiditis; or lumbar spinal stenosis resulting in pseudoclaudication.

R. 16. Jeske contends this analysis of the issue is clearly inadequate.

There is some support for Jeske's contention. Addressing a similar analysis of whether the plaintiff's degenerative disc disease met or equaled the same listing in *Minnick*, the court stated:

> This is the very type of perfunctory analysis we have repeatedly found inadequate to dismiss an impairment as not meeting or equaling a Listing. *See Kastner v. Astrue*, 697 F.3d 642, 647–48 (7th Cir. 2012) (remanding where the ALJ's cursory Listing analysis failed to articulate rationale for denying benefits when record supported finding in claimant's favor); *Barnett* [*v. Barnhart*], 381 F.3d [664,] 670 [(7th Cir. 2004)] (concluding the ALJ's "two-sentence consideration of the Listing of Impairments [was] inadequate and warrant[ed] remand."); *Brindisi v. Barnhart*, 315 F.3d 783, 786 (7th Cir. 2003) (reversing because ALJ's Listing analysis was "devoid of any analysis that would enable meaningful judicial review."). The ALJ dismissed the possibility of Minnick's degenerative disc disease meeting or equally

> Listing 1.04's criteria in two sentences. Beyond these two sentences, she provided
> no analysis whatsoever supporting her conclusion.

775 F.3d at 935–36. But the fact that the ALJ did not fully discuss the evidence concerning Jeske's spinal impairment at step 3 of the sequential analysis is not fatal. In *Curvin v. Colvin*, the court held that the ALJ's discussion of the claimant's severe and non-severe impairments, the objective medical evidence, and the claimant's credibility as part of the RFC determination can provide the necessary detail to review the ALJ's step 3 determination. 778 F.3d 645, 650 (7th Cir. 2015).

Jeske's assertion that the ALJ ignored substantial evidence that she met the criteria for listing 1.04 is belied by the ALJ's analysis supporting his RFC determination. There, the ALJ explicitly referenced a November 2012 MRI of Jeske's back showing "multilevel facet arthropathy" and noted that "the provider described it as just *mildly severe*." R. 19 (emphasis in original). The word "severe" appears to be a typo, since the actual MRI report notes only "mild facet arthropathy," at most, "minimal spinal canal stenosis," and "no abnormal signals in the cord." R. 442. Upon review of the MRI, Dr. Dewitt opined that Jeske's condition "was not a surgical condition, that she ought to exercise more, stop smoking and so on." R. 407.

As the ALJ observed, a SPECT study of Jeske's spine in February 2013 was also negative. R. 19. A SPECT (single-photon emission computerized tomography) scan is a type of nuclear imaging test that lets the doctor diagnose or monitor bone disorders. In a comparison with the November 2012 MRI, the SPECT study showed no abnormalities in the lumbar spine. The alignment of lumbar spine was found "unremarkable," as was the soft tissue uptake. R. 444.

The ALJ's assessment of Jeske's back impairment is also consistent with the report of the hospital emergency department where Jeske presented with a chief complaint of "back pain" on the

7

evening of October 31, 2012, and her treatment records. At the hospital, Jeske denied any numbness or tingling, and upon examination, the physician noted negative straight leg raising bilaterally, intact dorsi and plantar flexion strength, no dermatomal sensory loss, and full and symmetrical deep tendon reflexes. R. 435. The ER physician diagnosed an acute thoracolumbar strain, gave her 60 mg of Toradol, and sent her home with a prescription for muscle relaxants, pain medication, and a restriction for light duty for a week. R. 434–35.

Jeske began seeing Dr. Richard Sturm on November 1, 2012, through her employer's worker's compensation insurer and was referred to physical therapy. R. 445–46. A November 6, 2012 physical therapy intake report noted findings of significant limitations of motion, obvious demonstrated spasms, pain, weakness and impaired mobility, but Jeske was negative for dorsiflexion test and straight leg raising as well as piriformis test. Jeske continued to complain of pain and received a steroid injection in December of 2012. R. 440–41. According to a January 10, 2013 Worker's Compensation Report from Dr. Sturm, "she felt it was not acceptable for me to return her to unlimited work days," complaining that her work days were "9 or 10 hours, sometimes more." R. 407. Dr. Sturm explained that "there was no medical reason to keep her on a 4 hour a day schedule, as we have not found any serious structural pathology to account for her ongoing symptoms." *Id.*

Citing this and other records of office visits with Dr. Sturm on January 13, 2013, January 17, 2013, February 6, 2013, and February 20, 2013, the ALJ noted Jeske "consistently appeared functional with a normal gait and station, intact deep reflexes, and negative straight leg raise testing during examinations in 2012 and 2013." R. 19 (citing R. 407, 412, 417, and 421–22). In a January 17, 2013 report, Dr. Sturm noted that he had limited Jeske's lifting, carrying, pushing, and pulling

to 40 pounds, directed her to avoid extensive stooping, bending, stretching, and twisting, and limited her work day to 6 to 8 hours. R. 413. On February 6, 2013, Dr. Sturm noted that although Jeske reported only 10% improvement, she seemed "pretty functional" and "can do most of her regular job including full days without any hour restrictions." R. 416. At a February 20, 2013 visit, Jeske again reported "only 10% improvement compared to the worst," but Dr. Sturm noted she said "she sometimes works 38 hours over 4 days. In other words, over 9 hours a day. She is trying to avoid heavy lifting such as lifting coffins, but she can do all the other parts of her job." R. 421. On March 20, 2013, Jeske reported "only 20% overall improvement," but Dr. Sturm again noted that it appeared from his discussions with her that she could do "her entire job." R. 425. Dr. Sturm noted she "seems very happy with her progress. Pain is mostly left low back, no radiation." *Id.* Finally, at her last visit with Dr. Sturm on April 16, 2013, Jeske reported she had worked a 55 hour work week plus a 6 hour shift on Saturday because a co-worker had not shown up. She stated the "constant up and down motions, continuous walking, standing bothered her back." R. 429.

Subsequent reports of the physical therapist also support the ALJ's assessment. A report from the physical therapist on February 20, 2013, notes Jeske was working full-time and was able to sit with tolerable amounts of pain. R. 451. No significant gait abnormalities were observed, and she had negative slump and straight leg raising tests. The therapist noted that "at this time, signs and symptoms are consistent with back strain at L4-L5 levels" and that she "would benefit from continued physical therapy to progress towards her problem list." R. 452. In a June 10, 2013 discharge summary, the therapist noted that Jeske had been seen for biweekly sessions from February 22, 2013 through March 13, 2013 for range of motion, strengthening, modalities, manual therapy, and TENS unit fitting. On her last visit she rated her pain at 2–3/10, and was doing much

9

better. She had a follow up visit scheduled for March 15, but had called to cancel because she was sick, and had not reestablished contact thereafter.

There is no other record of Jeske seeking treatment for her back condition after April 2013, either before or after her amended inception date of January 1, 2014. Although she testified that she had no insurance, Dr. Sturm had made clear to her that because her injury was work related she had the option for seeking further treatment under her employer's worker's compensation insurance. R. 430. In any event, because of the absence of any recent treatment records concerning her back, the SSA requested Dr. A. Neil Johnson to examine Jeske in October 2016 to evaluate her complaints.

Discussing Dr. Johnson's report of his physical examination, the ALJ noted Jeske exhibited "a normal gait (albeit with some pain) and just mild deficits in tandem walking. R. 19 (citing R. 463). She also "maintained full extension, side lateral flexion, and rotation range of motion, symmetrical reflexes, [and] intact use of her hands (button, pick up a coin, and open a door)." *Id.* According to the report, Jeske reported tenderness across the lumbar spine, but Dr. Johnson "did not appreciate any spasm." R. 463. On straight leg raising, Jeske reported back pain going into the legs at 30 degrees on the left and at 40 degrees on the right. *Id.* On motor strength testing of both legs, Jeske reported "a lot of pain," and Dr. Johnson noted "there was give away with both" and "[s]he seemed to struggle to fully extend both her legs." R. 464. "'Giveaway weakness' may be a sign of exaggeration of pain." *Simila v. Astrue*, 573 F.3d 503, 508 (7th Cir. 2009) (citing MURIEL D. LEZAK ET AL., NEUROPSYCHOLOGICAL ASSESSMENT 326 (4th ed. 2004) ("Neurological examiners repeatedly noted give-away weakness (poor effort on strength testing) indicating that [the patient] was actively preserving a disability status.")).

10

Dr. Johnson listed "chronic back pain" in his conclusions and noted Jeske's October 31, 2012 injury and the 2012 MRI showing "mild facet level arthropathy at multiple levels. R. 465. Dr. Johnson noted Jeske's complaint of ongoing pain and that she did not have health insurance, and observed she could not get "much evaluated at this point." *Id.* He stated she reported "some decreased sensation in the left leg, but again noted "there was give away loss of strength in both legs. The left leg is the worst." *Id.*

A Radiology Report of an X-ray taken of Jeske's lumbar spine, apparently in conjunction with the medical examination, states:

> Vertebral height and alignment are satisfactory. Disc spaces appear adequately maintained. No end plate spurring or eburnation can be identified. I see no abnormalities affecting the posterior elements or sacroiliac joints.

R. 468. And as the ALJ also noted, two state agency consultants, Drs. Pat Chan and Mina Khorshidi, reviewed the entire file in 2016 and concluded that Jeske was physically capable of light work. R. 20 (citing R. 66, 96–97).

Finally, referring to a June 2017 hospital report concerning Jeske's hospitalization for an unrelated medical problem, the ALJ noted "more recently treatment providers documented her having a normal gait, sensation, and motor functioning." R. 19 (citing R. 474). Based on the entire record, the ALJ concluded:

> [T]he claimant's ability to work at above the substantial gainful activity level for more than a year, no more than mild findings on diagnostic imaging, and generally good objective physical examination findings do not support the claimant's reported limitations, suggests she is not as limited as her allegations of disability indicate, and supports the conclusion that she remains capable of performing work within the restrictions set forth in the residual functional capacity finding above.

R. 19.

11

This analysis was more than sufficient to support the ALJ's finding at step 3 of the sequential analysis that Jeske's back condition did not meet Listing 1.04. The ALJ identified the potentially applicable listing by name; explained that the evidence did not meet the listed criteria; and later analyzed Jeske's severe and nonsevere impairments, medical evidence and opinions, and Jeske's subjective symptoms. Because the ALJ met his duty to articulate his step three finding and the finding is supported by substantial evidence in the record, the ALJ's step three determination must stand.

**B.    Reliance on Activities of Daily Living**

Jeske next argues that the ALJ not only mischaracterized her daily activities, but also inappropriately relied on her ability to perform activities of daily living in finding she was able to sustain competitive full time employment. This argument focuses on the following language from the ALJ's eleven-page decision offered in partial support for his RFC determination:

> In addition, the claimant's [sic] reported rather good activities of daily living prior to the hearing (although she indicated being less capable at the hearing). Specifically, she indicated not needing any special reminders to take care of her personal hygiene, caring for her children (four boys ages 10-21), cooking, cleaning, managing money, shopping, and driving (Exhibits 10E, 3F, Hearing Testimony).

R. 20.

Exhibit 3F, the September 24, 2016 report by Dr. Anthony Wendorf of his psychological evaluation of Jeske supports the ALJ's statement that Jeske's daily activities included caring for her children, cooking, cleaning, managing money, shopping, and driving. According to his report, when asked what she does in a typical day, Jeske told Dr. Wendorf that "she takes care of the kids and will try to relax and take care of herself to manage her pain." R. 458. She added that "she does the cooking, cleaning, grocery shopping, and handles the money." *Id.*   It is true that in the Function

Report she submitted to the SSA, Exhibit 10E, and in her hearing testimony, as the ALJ acknowledged, Jeske indicated she was less capable. But the fact that her accounts of her daily activities were inconsistent does not mean the ALJ mischaracterized them in relying on the version she gave the evaluating psychologist.

Nor is it true to say that the ALJ relied upon her account of her daily activities in finding that she was able to maintain full-time employment. While an ALJ must consider a claimant's activities of daily living, 20 C.F.R. § 404.1529(c)(3)(I), it impermissible to infer that a claimant is capable of full-time work based on the claimant's ability to perform activities of daily living. *See Stark v. Colvin*, 813 F.3d 68, 688 (7th Cir. 2016); *Moore v. Colvin*, 743 F.3d 1118, 1126 (7th Cir. 2014). But that is not what the ALJ did here. The ALJ found that her claimed limitations were not consistent with the medical evidence and the record as a whole. In other words, the ALJ found that she was exaggerating the extent of her pain and disability. Based on the discussion of that evidence above, the ALJ's conclusion was not unreasonable.

**C.     At Will Sit/Stand Option and Unskilled Occupation Limitation in the RFC**

Jeske next argues that the at will sit/stand option combined with the unskilled occupation limitation in her RFC conflicts with social security rules and so severely eroded the number of jobs in the national economy such that the VE's findings were unsupported and she should be found to be disabled. In particular, Jeske points out that unskilled light work requires "a person to be standing or walking most of the workday," S.S.R. 83-14, that "[r]elatively few unskilled jobs are performed in a seated position," S.S.R. 83-10, and that "[u]nskilled types of jobs are particularly structured so that a person cannot ordinarily sit or stand at will." S.S.R. 83-12. The rules also state

13

that "[i]n cases of unusual limitation of ability to sit or stand, a [Vocational Specialist] should be consulted to clarify the implications for the occupational base." *Id.*

But that is exactly what occurred here. The ALJ posed such a question to the VE at the hearing, specifically asking what effect an at will sit/stand option would have upon the number of jobs available and identified by the VE. R. 52–53. The VE answered that one type of job would be eliminated, that the number of remaining mail clerk and inspector positions would be eroded, but that there would still be approximately 130,000 jobs in the national economy that Jeske could perform. R. 53. No objections were made to the VE's testimony at the hearing. "Where, as here, the VE identifies a significant number of jobs the claimant is capable of performing and this testimony is uncontradicted (and is otherwise proper), it is not error for the ALJ to rely on the VE's testimony." *Liskowitz v. Astrue*, 559 F.3d 736, 745–46 (7th Cir. 2009).

### D.    April 2013 Visit With Dr. Sturm

Jeske next argues that the absence of any discussion of Dr. Richard Sturm's opinion from her visit in April of 2013 warrants the remand of the ALJ's decision because all medical opinions in the record must be considered and those of treating physicians must be given controlling weight when well supported and in the absence of substantial evidence to the contrary. "Medical opinions are statements from acceptable medical sources that reflect judgments about the nature and severity of [the claimant's] impairment(s), including [the claimant's] symptoms, diagnosis and prognosis, what [the claimant] can still do despite impairments(s), and [the claimant's] physical or mental restrictions." 20 C.F.R. § 404.1527(a)(1). "Omitted from this definition are opinions about a claimant's ability to work, a question the regulation reserves for the Commissioner." *Loveless v.*

14

*Colvin*, 810 F.3d 502, 507 (7th Cir. 2016) (holding that the ALJ did not have to accept a doctor's conclusory statement that the claimant could not work).

Jeske's argument is based upon the following comments from Dr. Sturm's notes of Jeske's April 16, 2013 visit:

> Finally, she is asking if I think she will ever really improve. I think she will. Perhaps in 6 or 8 months she will get back to baseline, particularly if she can cut back her long work weeks or maybe she needs to reduce her work commitment to say 30 hours a week, try going part-time to see if this helps her back. Maybe sometime later in life she can go back to 40 hours. I am not sure if these are options for her, however.

R. 430. Although the ALJ discussed Dr. Sturm's medical records and restrictions, he did not address this specific conversation. Jeske contends the case must therefore be remanded.

This is not a medical opinion. Rather these are speculative statements—evidenced by the use of "perhaps," "I think," "maybe," and "I am not sure"—about when Dr. Sturm thought Jeske would return to her baseline, and not a definitive prognosis. Even if it was a medical opinion, it would have little or no relevance, since it precedes Jeske's January 1, 2014 amended onset date by more than seven months. Dr. Sturm did not see or treat Jeske after that time.

More importantly, Jeske has taken the statement out of context. Jeske was asking Dr. Sturm whether he thought she would improve while continuing to work at the job she then held requiring her to work 10-hour days and up to 55 hours a week with the constant up and down motions, continuous walking, and standing. R. 429. Jeske told Dr. Sturm that she loved her job, but she was worried she was still having back pain. It was in this context that Dr. Sturm told her that, given her active family life at home with four boys, she might consider cutting back her hours to something more reasonable. At the same time, he limited her work to 8 hours per day "to minimize her

15

symptoms," but otherwise imposed no restrictions. R. 430. The ALJ did not err in failing to address it.

**E.    Function-by-Function RFC Assessment**

Jeske contends that, because the ALJ's RFC assessment did not contain a function-by-function assessment and did not address each of the seven strength demands separately as required by S.S.R. 96-8p, the ALJ erred. While a "function-by-function assessment of an individual's limitations ensures that the ALJ does not overlook an important restriction and thereby incorrectly classify the individual's capacity for work," S.S.R. 96-8p does not require that an ALJ assess every single work-related function: "[A]n ALJ need not provide superfluous analysis of irrelevant limitations or relevant limitations about which there is no conflicting medical evidence." *Zatz v. Astrue*, 346 F. App'x 107, 111 (7th Cir. 2009). Rather S.S.R. 96-8p requires an ALJ to provide a "narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence." *Ronning v. Colvin*, No. 13 CV 8194, 2015 WL 1912157, at *6 (N.D. Ill. Apr. 27, 2015); *Knox v. Astrue*, 327 F. App'x 652, 657 (7th Cir. 2009) ("[a]lthough the RFC assessment is a function-by-function assessment, SSR 96–8p, the expression of a claimant's RFC need not be articulated function-by-function; a narrative discussion of a claimant's symptoms and medical source opinions is sufficient") (internal quotations omitted). Here, the ALJ provided such a narrative explaining his conclusion:

> Due to claimant's spinal disorder, the undersigned finds she is unable to sustain the lifting or carrying requirements of medium or greater exertional work and is therefore limited to light work. She must also be allowed to alternate between sitting and standing at will to account for her reported reduced sitting and standing tolerances. Additionally, she is restricted to no more than occasional stooping, crouching, kneeling, crawling, or climbing of ramps and stairs; and no climbing of ladders, ropes, and scaffolding to account for her spinal condition and reported pain.

R. 18.  The ALJ's use of light work here addresses other strength demands as the definition of light work inherently carries restrictions on lifting and carrying.  20 C.F.R. § 404.1567(b) ("Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.").  The light work restriction also finds support in the record and the opinions of Drs. Pat Chan and Mina Khorshidi.  R. 65, 96–97.  Accordingly, the ALJ's decision satisfies the requirements of S.S.R. 96-8p.

## CONCLUSION

For the foregoing reasons, the decision of the Commissioner is **AFFIRMED**.  The Clerk is directed to enter judgment accordingly.

**SO ORDERED** this  25th  day of March, 2019.

s/ William C. Griesbach
William C. Griesbach, Chief Judge
United States District Court
